UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VETERAN MEDICAL PRODUCTS, INC.,
et al.,

       Plaintiffs,

v.

Case No. 1:05-cv-655
Hon. Hugh W. Brenneman, Jr.

BIONIX DEVELOPMENT CORPORATION,
et al.,

       Defendants.
                                       /

**OPINION**

This matter is now before the court on plaintiffs' motion for summary judgment with respect to defendants' counterclaims (docket no. 56).

    **I.**    **Plaintiffs' complaint**

Plaintiffs Veteran Medical Products, Inc. ("Veteran Medical"), Tillman Industries, Inc.("Tillman Industries"), Joseph Szyperski ("Szyperski"), Patrick Eddy ("Eddy"), John Kotwick ("Kotwick"), Mark Longcore ("Longcore") and Ryan Heidenfeld ("Heidenfeld") set forth the following allegations in their complaint. Veteran Medical produces a plastic ear curette. On September 7, 2005, defendant Andrew J. Milligan ("Milligan") the chief executive officer of defendant Bionix Development Corporation ("Bionix"), telephoned Veteran Medical and accused it of infringement on United States Patent No. D423,669 ("the '669 Patent") previously issued to Bionix. Compl. at ¶¶ 13-14. On September 9th, Milligan accused Veteran Medical of patent infringement and misappropriation of trade secrets. *Id.* at ¶ 15. On September 14, Milligan telephoned one of Veteran Medical's suppliers and accused both the supplier and Veteran Medical

of patent infringement and interfering with a pre-existing business relationship. *Id.* at ¶ 16. On September 16th, Milligan telephoned Veteran Medical and again accused it of patent infringement and misappropriation of trade secrets. *Id.* at ¶ 17. Then, on September 20th, defendants wrote to plaintiffs accuse them of infringing the '669 Patent and demanding that the infringement cease "under pain of an express threat of imminent litigation." *Id.* at ¶ 18.

On September 23rd, plaintiffs filed the present action alleging that defendants' conduct placed them under a reasonable apprehension of litigation relating the accused infringement of the '669 Patent. Plaintiffs sought a declaratory judgment that the '669 Patent was not infringed and that no trade secrets had been misappropriated from defendants. *Id.* at ¶¶ 20-24. In addition, plaintiffs sought damages for: federal unfair competition pursuant to 16 U.S.C. § 1125(a) (Count I); violation of the Michigan common law of unfair competition, business defamation and product disparagement (Count II); and tortious interference with business relationships (Count III).

Defendants filed three counterclaims against plaintiffs. First, defendants alleged that plaintiffs infringed the '669 Patent. Second, defendants alleged that plaintiffs misappropriated Bionix's confidential and proprietary information and trade secrets in violation of Michigan law. Third, defendants alleged that plaintiffs willfully and maliciously misappropriated and used, and are willfully and maliciously using, Bionix's trade secrets and confidential proprietary information.

On August 6, 2007, plaintiffs Kotwick and Longcore voluntarily dismissed their claims against defendants, and defendants voluntarily dismissed the counterclaims asserted against these two plaintiffs. The remaining plaintiffs filed the present motion seeking summary judgment on the three counterclaims. Shortly after the motion hearing, the court granted plaintiffs' action for declaratory judgment "to the extent that it seeks a declaration that the '669 Patent is not infringed

by the plaintiffs," and further ordered "that the defendants' first counterclaim, which alleges infringement of the '669 Patent, and all relief sought in the counterclaim based thereon, is DISMISSED." *See* docket no. 74. This opinion addresses plaintiffs' remaining motion for summary judgment as to the second and third counterclaims.

## II. Summary Judgment standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

## III. Discussion

### A. Bionix's counterclaims.

Bionix brings its counterclaims under the Michigan Uniform Trade Secrets Act ("MUTSA"), M.C.L. § 445.1901 *et seq.* "MUTSA provides a statutory action and remedies for misappropriation of trade secrets" that "displaces conflicting tort remedies for misappropriation of

3

a trade secret." *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F.Supp.2d 943, 946 (W.D. Mich. 2003). *See CMI International, Inc. v. Intermet International Corporation*, 251 Mich.App. 125, 132, 649 N.W.2d 808 (2002) (MUTSA "displaced conflicting tort remedies for misappropriation of a trade secret"); M.C.L. § 445.1908 (MUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret" but it does not affect "[c]ontractual remedies, whether or not based upon misappropriation of a trade secret," "[o]ther civil remedies that are not based upon misappropriation of a trade secret," and "[c]riminal remedies, whether or not based upon misappropriation of a trade secret").

Bionix's counterclaims identify neither the "trade secrets" nor the method by which those secrets were misappropriated. However, in its response to the motion for summary judgment, Bionix identifies two trade secrets. First, it identifies as a trade secret, its manufacturing forecasts, costs, and demand and market projection information pertaining to the overall volume of a particular Bionix curette, which Bionix refers to collectively as "the business plan." It identifies as its second trade secret, "the elasticity and flexibility moduli and the acceptable flash tolerances necessary to manufacture a plastic ear curette," which Bionix refers to as "the technical information."[1]

---

[1] The court notes that Milligan mentioned six trade secrets in his deposition: (1) "the concept of an ear curette, which your clients had no knowledge of before they signed a confidentiality agreement with us;" (2) "the market forecasts for those curettes;" (3) "the characteristics of the plastics and others that -- other components which are used to manufacture those ear curettes;" (4) "the sales and distribution of those ear curettes;" (5) "the marketing of those ear curettes;" (6) "the ultimate end users of the ear curettes;" (6) "the function of the ear curettes;" and, (7) "a whole myriad of characteristics of those ear curettes that surround the manufacturing and utilization." Milligan Dep. at 27-29 (attached to plaintiff's brief as Exh. 1). However, as previously discussed, defendants only identified the business plan and technical information as the trade secrets at issue in this litigation.

### B. The Michigan Uniform Trade Secrets Act.

"The first element a plaintiff alleging misappropriation of trade secrets must prove is that the information at issue actually constitutes a 'trade secret.'" *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 410 (6th Cir. 2006). MUTSA defines a "trade secret" as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:
>
> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

M.C.L. § 445.1902(b).

Under MUTSA, "the essence of a trade secret is that it derives its value from secrecy." *Stromback v. New Line Cinema*, 384 F.3d 283, 305 (6th Cir. 2004). "Under Michigan law, a trade secret cannot consist of 'information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship.'" *Wysong Corp. v. M.I. Industries*, 412 F.Supp.2d 612, 627 (E.D. Mich. 2005), *quoting Kubik, Inc. v. Hull*, 56 Mich.App. 335, 348, 224 N.W.2d 80 (1974). To constitute a trade secret, a pattern, technique or process does not need to reach the level required of an invention seeking to obtain patent protection. *Mike's Train House*, 472 F.3d at 410. "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Id.* at 410-11.

Next, MUTSA defines four ways in which a party can misappropriate a "trade secret":

> (i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.
>
> (ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
>
>> (A) Used improper means to acquire knowledge of the trade secret.
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.
>>
>> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

M.C.L. § 445.1902(d).

"Sufficient measures" taken to protect the secrecy of confidential information as a "trade secret" under MUTSA have been found to include "either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized by the employer to insure that only a limited number of authorized individuals have access to the information." *Wysong Corp. v. M.I. Industries*, 412 F.Supp.2d 612, 626 (E.D. Mich. 2005), *quoting Kubik*, 56 Mich. App. at 347-348.

**C.    Background**

Drs. Milligan and James J. Huttner ("Huttner") formed Bionix in 1984. Milligan Dep. at 14. In his affidavit, Huttner states that Bionix revolutionized the ear curette market by producing disposable plastic ear curettes. Huttner Aff. at ¶¶ 4-5 (docket no. 67). Bionix performed significant research and clinical testing to develop the right balance between flexibility and elasticity, and to control the amount of flash to safely remove wax from deep inside the sensitive ear canal. *Id.* at ¶ 12. On April 25, 2000, the United States Patent and Trademark Office issued the '669 Patent for Bionix's double-ended curette. *See* '669 Patent (attached to defendants' response as Exh. C).

Bionix engaged the Tech Group to produce components for a lighted ear curette, a product that is not the subject of this litigation. Szyperski Dep. at 30 (attached to defendants' response as Exh. E). Indeed, the specifications for the two types of product are quite different. Bionix typically enters into confidentiality agreements with the companies that manufacture components for its products. Milligan Dep. at 52-53. On February 18, 2003, Bionix and the Tech Group entered into such an agreement, which provided in pertinent part as follows:

3.   Description of Confidential Information: The fact that the parties have entered into this Agreement, or that there is any relationship between the parties, is Confidential Information.  In addition, the Confidential Information disclosed under this Agreement is described as injected molded medical device.

4.   Use of Confidential Information: The party receiving Confidential Information ("Recipient") shall not disclose or make use of the Confidential Information in any way, except for the following purpose: to quote, evaluate produce [sic] and offer feedback.

5.   Confidentiality Period: Recipient's duty to protect Confidential Information expires three (3) years after the Expiration Date for this Agreement specified in section 6.

7

6. Disclosure Period: This Agreement pertains to Confidential Information described in Paragraph 3 that is disclosed between the Effective Date , which shall occur one (1) year after the Effective Date.

7. Standard of Care: Recipient shall protect the disclosed Confidential Information by using the same degree of care, but no loess than a reasonable degree of care, to prevent the unauthorized use, disclosure, dissemination, or publication of the Confidential Information as Recipient uses to protect its own Confidential Information of a like nature. Recipient shall not reproduce, provide, or otherwise make available any Confidential Information to any person other than those of its employees who have a need to know consistent with Recipient's authorized use of such information. Recipient agrees that it will take appropriate action by instruction or agreement with its employees and other persons permitted access to Confidential Information to satisfy its obligations with respect to the use copying, security, and protection of the Confidential Information. Upon written request, the Recipient shall return all tangible Confidential Information to the Discloser within 10 days after receipt of the request, and provide a written certification that no Confidential Information has been retained.

8. Marking: Recipient's obligations shall only extend to Confidential Information described in Paragraph 3, that is: (1) marked as confidential at the time of disclosure; or, (b) unmarked (e.g., orally disclosed) but identified as confidential at the time of disclosure, and is confirmed as Confidential Information in a writing sent to Recipient's representative within thirty days of disclosure.

9. Exclusions: This Agreement imposes no obligation upon Recipient with respect to information that: (a) was rightfully in Recipient's possession before receipt from Discloser; (b) is or becomes public knowledge through no fault of Recipient or Recipient's employees; (c) is rightfully received by Recipient from a third party without restriction and without knowledge of any obligation of confidentiality between the third party and Discloser; (d) is independently developed by Recipient without reliance on the Confidential Information (by personnel to whim the Confidential Information was not disclosed); (e) is disclosed under operation of law; or (f) is disclosed by Recipient with Discloser's prior written approval. . . .

17. This Agreement is made under, and shall be construed according to, the substantive laws of the State of Ohio.

*See* Nondisclosure Agreement at ¶¶ 3-9, 17 (attached Milligan Dep. as Exh. 11).

In the course of its business relationship with the Tech Group, Bionix disclosed information to the Tech Group regarding its business plan with respect to the manufacture, production and marketing of ear curettes. Milligan Dep. at 80-86; Huttner Dep. at 48-50 (attached to defendants' response as Exh. B); Szyperski Dep. Exh. Nos. 143, 145, 146, 147, 148, 149, 150, 151, 152. Bionix also disclosed technical information, such as the elasticity and flexibility moduli and the acceptable flash tolerances necessary to manufacture a plastic ear curette. Milligan Dep. at 68-70; Huttner Dep. at 46-50; Huttner Aff. at ¶ 14.

Szyperski was one of Tech Group's main contacts with Bionix, Huttner Dep. at ¶ 17, and was a senior project engineer at Tech Group. Szyperski Dep at 26. His responsibilities included working with customers to provide quotes for the manufacture of their products. *Id.* This could include quotes for injection molding, assembly and sterilization. *Id.* He also helped with product line support, to solve problems in the production, and to "develop fixtures for ease of manufacture consistency." *Id.* Szyperski was aware of the tooling and molding issues related to the Bionix project, as well as the market demand for Bionix's lighted ear curettes and the plastic ear curettes. *Id.* at 59-61; Szyperski Dep. Exh. Nos. 143, 145, 146, 147, 148, 149, 150, 151, 152.

Szyperski spoke with Eddy, the Tech Group's engineering manager, about the Bionix project details at the weekly engineering department meetings. Szyperski Dep. at 33; Eddy Dep. at 24 (attached to defendants' response as Exh. D). These discussions included the Tech Group's profit margins on the tooling and molding issues. *Id.* at 33-34.

Heidenfeld was an associate process engineer at the Tech Group. Heidenfeld Dep. at 22 (attached to defendants' response as Exh. F). One of his responsibilities was "to standardize methodologies by which processes were developed for injection molds." *Id.* Heidenfeld aided in

9

the design of the injection molds and establishing the molding process for Bionix's lighted ear curettes. *Id.* at 22-23.

Roosevelt Tillman ("Tillman") was involved in the business construction trade for many years, having constructed or developed night clubs and restaurants. Tillman Dep. at 8 (attached to defendants' brief as Exh. H). He formed Tillman Industries in 2000 to perform injection molding "to kind of service the medical device industry." *Id.* at 8. At that time, he had no experience with either injection molding or medical devices, and Tillman Industries had no employees. *Id.* at 8-10. In the fall of 2004, Sean Callaghan, a plastics engineer employed as Director of Operations as Lacks Industries, met Tillman and discussed the development of injection molded plastic medical devices. Callaghan Decl. at ¶¶ 5-6 (attached to plaintiffs' brief as Exh. 6). Specifically, they discussed a plastic dental brush that Callaghan had been developing. *Id.*

Callaghan, a mutual acquaintance of Tillman and Eddy, recommended Eddy's name to Tillman. Eddy Dep. at 29-31. Sometime prior to September 2004, Tillman contacted Eddy about employment at Tillman Industries to "[b]uild a molding company." Eddy Dep. at 29. Eddy, in turn, recruited Szyperski, Heidenfeld and Longcore from the Tech Group. Eddy Dep. at 35-38; Szyperski Dep. at 54; Longcore Dep. at 24-25 (attached to defendants' response as Exh. I). Longcore testified that Eddy approached him during the summer of 2004, and told him that the project engineers were going to lose their jobs by Christmas. Longcore Dep. at 24. Eddy suggested Tillman Industries as a viable employment option. *Id.* at 24-25.

The four former Tech Group employees began work at Tillman Industries in September 2004. Eddy Dep. at 28; Szyperski Dep. at 52-55; Longcore Dep. at 19-20; Heidenfeld Dep. at 22. At the time they were hired, Tillman Industries "was a shell of a building" that had no

10

production. Longcore Dep. at 27. In October 2004, each of the former Tech Group employees received a cease and desist letter from the Tech Group's corporate counsel. Eddy Dep. at 39-40; Szyperski Dep. at 20; Heidenfeld Dep. at 18; Longcore Dep. at 17-18. The letters, dated October 13, 2004, advised them that "Tillman Injection Molding" contacted a former customer of the Tech Group with confidential information shared only with the Tech Group's Grand Rapids engineering personnel. Eddy Dep. Exh. 126; Szyperski Dep. Exh. 142; Heidenfeld Dep. Exh. 138; Longcore Dep. Exh. 135. The Tech Group advised them of their duty not to disclose such confidential information, and demanded the return of any Group Tech records, reports or documents in their possession. *Id.*[2]

Tillman testified that he could not recall when Tillman Industries first discussed the possibility of creating plastic ear curettes, giving various dates from 2005 to late 2006. Tillman Dep. at 16. Callaghan first learned of an "ear curette" in January 2005. Callaghan Dep. at 14 (attached to defendants' response as Exh. G). That month, Tillman and Callaghan met with a purchasing agent at Spectrum Health in Grand Rapids, who suggested that Spectrum might be interested in purchasing ear curettes from someone other than its current suppliers. Callaghan Decl. at ¶ 7. The purchasing agent gave Tillman and Callaghan a Miltex ear curette as an example. *Id.* Callaghan gave three reasons for developing an ear curette at that time: it had a shape similar to the dental brush that he had been designing; it was easier to manufacture than the brush; and they (i.e., Tillman Industries) had "a committed customer to sell product to." *Id.* at ¶ 8.

---

[2] The letters addressed to Szyperski, Heidenfeld, and Longcore demanded enforcement of a confidentiality agreement that each of them signed with the Tech Group. Eddy's letter referenced a breach of his common law duties owed to his former employer, the Tech Group.

11

Sometime in February 2005, Tillman Industries had drafted a comprehensive ear curette marketing plan. Callaghan Dep. at 14; "Ear Curette Marketing Plan" attached to Callaghan Dep. as Exh. 108.[3] Then, on May 11, 2005, Eddy, Callaghan and Tillman formed Veteran Medical to design, market, and sell medical products, including plastic ear curettes, which Tillman Industries was to manufacture. Callaghan Decl. at ¶¶ 9-10. Veteran Medical began marketing its ear curettes in August 2005. Callaghan Decl. at ¶ 12.

**D.     The business plan**

Bionix contends that Szyperski and Eddy wrongfully used its business plan to benefit Tillman Industries and Veteran Medical. The record reflects that Bionix revealed manufacturing forecasts and costs, demands and market projection information pertaining to the overall volume of Bionix curettes to Szyperski. *See* e-mails dated 11/17/2003; 4/29/2004; 8/6/2004; and 8/20/2004, attached to Szyperski Dep. as Exhs. 146, 147, 150, 151. This information included the 12-month estimated volume for Bionix's lighted curettes and its "standard" polypropylene ear curettes. Szyperski Dep. Exhs. 147, 150, 151; Syzperski Dep. at 46-51; Huttner Dep. at 44; Milligan Dep. at 100-01, 104. In addition, Szyperski was given information regarding the production tooling and molding cost for a particular curette, illustrating costs per unit to the ten-thousandth of a cent. *See* e-mail dated April 30, 2004, attached to Szyperski Dep. as Exh. 148. Eddy was privy to this information by virtue of his position as the Tech Group's engineering manager. Szyperski Dep. at 33-34.

To qualify as a "trade secret" under MUTSA, defendants must demonstrate that the business plan disclosed to Syzperski meets the requirements of M.C.L. §§ 445.1902(b)(i) and (ii).

---

[3] The marketing plan was labeled for "Tillman Sciences."

First, the court concludes that Bionix's business plan disclosed to Syzperski meets the requirements of M.C.L. § 445.1902(b)(i), because it is "information" that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." Veteran Medical presents no evidence that the information contained in the e-mails to Syzperski was generally known or readily ascertainable. Knowledge of Bionix's manufacturing costs and production forecasts would have value to a competitor in the ear curette market. *See, e.g., EFCO Corp. v. Symons Corp.*, 219 F.3d 734, 741 (8th Cir. 2000) (corporation's research, development, pricing, cost and marketing data may be "trade secrets" under Iowa's version of the Uniform Trade Secrets Act); *Spartanburg Regional Healthcare System v. Hillenbrand Industries, Inc.*, No. 1:05-MC-107, 2005 WL 2045818 at *3 (W.D. Mich. 2005) (observing that documents relating to matters such as business planning, strategic analysis, actual or forecasted business, financial performance, sales revenue and market share, are sensitive and confidential business information that would subject the business to significant harm); *Wysong Corporation v. M.I. Industries*, 412 F. Supp.2d 612, 631 (E.D. Mich. 2005) (financial information summarizing projections for the company's 2000 sales is confidential because it derives its potential economic value from not being generally known).

    The second requirement for a trade secret as set forth at M.C.L. § 445.1902(b)(ii), is that Bionix made this information "the subject of efforts that are reasonable under the circumstances to maintain its secrecy," is less clear. There is no question that Bionix took some steps to maintain the secrecy of this information. For example, it entered into the February 18, 2003 nondisclosure agreement with the Tech Group. In addition, its e-mails sent to Szyperski were marked as confidential, containing the following language:

13

> This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed.  If you are not the intended recipient or the person responsible for delivering this email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited.  If you have received this email in error, please notify me immediately.

*See* Szyperski Dep Exhs.  146, 147, 148, 150, 151.

The execution of the nondisclosure agreement and confidentiality notice on the e-mails constitute a reasonable effort by Bionix to maintain the secrecy of its business plan.  *See, e.g.*, *Tom James Co. v. Hudgins*, 261 F.Supp.2d 636, 641-42 (S.D. Miss. 2003) (employee's execution of a nondisclosure agreement and other documents advising him that certain information was confidential and a trade secret, established a reasonable effort to maintain secrecy under Mississippi's version of the Uniform Trade Secrets Act);  *Liberty American Ins. Group, Inc. v. WestPoint Underwriters, L.L.C.*, 199 F.Supp.2d 1271, 1286 (M.D. Fla. 2001) (plaintiff took reasonable efforts to maintain the secrecy of computer software under Florida's version of the Uniform Trade Secrets Act by restricting access to its programmers and to third parties who have licensing agreements with it and by requiring key employees who have access to the software to sign confidentiality agreements);  *Niemi v. American Axle Mfg. & Holding, Inc.*, No. 269155, 2007 WL 29383 at *2 (Mich. App. Jan. 4, 2007) (failure to enter into written confidentiality agreements and label documents "confidential" belied plaintiffs' claim that the information were trade secrets under MUTSA);  *ReadyLink Healthcare v. Cotton*, 126 Cal.App.4th 1006, 1018, 24 Cal.Rptr.3d 720 (4th Dist. 2005) (noting that company took steps to ensure the secrecy of its trade secret information by requesting employees to sign nondisclosure agreements).

However, a question of fact exists as to whether Bionix's efforts extended to all of the information disclosed to Syzperski.  At the time Szyperski received the e-mails, he was

employed by the Tech Group. The record reflects that the Tech Group was bound by the terms of the non-disclosure agreement during some of Syzperski's tenure, i.e., the one year "disclosure period" following the execution of the non-disclosure agreement on February 18, 2003. *See* Nondisclosure Agreement (attached to plaintiffs' brief as Exh. 5). Only one of the Syzperski e-mails is dated prior to the one year effective period of the nondisclosure agreement. There is no evidence that Bionix extended this agreement beyond February 2004. Bionix's failure to extend the agreement suggests an intent not to protect information disclosed after the one-year disclosure period. Accordingly, genuine issues of material fact exist regarding the extent of Bionix's efforts to protect its business plan information disclosed after February 2004.

Next, plaintiffs contend that Bionix has no direct evidence of the misappropriation of its trade secrets. The court disagrees. Longcore testified that either Szyperski, Heidenfeld, Eddy or Kotwick brought "wrongful material" from the Tech Group to Tillman Industries, which was subject to a confidentiality agreement as referenced in the October 2004 cease and desist letter. Longcore Dep. at 17-20. Longcore identified the materials as specifications, SOPs (standard operating procedures) and a "quote template" on his computer desktop. *Id.* at 19-20. He did not open the specifications or SOPs, but identified the quote template as an Excel spreadsheet. *Id.* at 20. These materials on Longcore's computer were discarded (in his words, "my computer was emptied") approximately one day after Longcore, Szyperski, Heidenfeld, Kotwick and Eddy met to discuss the October 13, 2004 cease and desist letter. *Id.* at 31.

As to this last point, the former Tech Group employees disagree on whether they had a meeting to discuss the letter or whether they even discussed the letter amongst themselves. Longcore states that he met with Szyperski, Heidenfeld, Kotwick and Eddy to discuss the October

13, 2004 cease and desist letter.  Longcore Dep. at 18.  Szyperski testified that he asked Eddy about the letter, and was told not to worry about it.  Szyperski Dep. at 20-21.  Heidenfeld testified that he did not recall meeting with the other former Tech Group employees about the letter. Heidenfeld Dep. at 21-22.  Finally, Eddy did not recall discussing the letter with the other former Tech Group employees.  Eddy Dep. at 39-40.  This disagreement presents a disputed issue of fact as to whether the "wrongful material" on Longcore's computer involved Bionix products and when the material was removed from his computer.

Next, plaintiffs cite no authority to support their contention that Bionix needs direct evidence, rather than circumstantial evidence, to prove the misappropriation claim.  The plaintiff in a trade secret misappropriation action  faces a difficult challenge in ferreting out evidence of misappropriation.  The holder of a trade secret "takes a substantial risk that the secret will be passed on to his competitors, by theft or by breach of a confidential relationship, in a manner not easily susceptible of discovery or proof."  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 490 (1974).

In the absence of any state law authority on this issue, the court agrees with the reasoning expressed in *Stratienko v. Cordis Corp.*, 429 F.3d 592 (6th Cir. 2005), that circumstantial evidence may be used to establish the misappropriation of a trade secret under the Uniform Trade Secrets Act.  *Stratienko* involved a misappropriation claim under Tennessee's version of the Uniform Trade Secrets Act.  In *Stratienko*, the court observed that misappropriation and misuse of a trade secret "can rarely be proved by convincing direct evidence."  *Stratienko*, 429 F.3d at 600. "Thus, requiring direct evidence would foreclose most trade-secret claims from reaching the jury because corporations rarely keep direct evidence of their use ready for another party to discover." *Stratienko*, 429 F.3d at 601.  After reviewing opinions from other circuits which have considered

16

"circumstantial evidence concerning similarity of design plus access to the design to imply use by a defendant of a trade secret," the court determined that circumstantial evidence may be used to establish a violation. *Id.* at 600. Thus, "once evidence of access and similarity is proffered, it is entirely reasonable for the jury to infer that defendant used plaintiff's trade secret." *Id.* at 600 (internal quotes and brackets omitted).

Based on the circumstantial evidence, a jury could reasonably infer that plaintiffs misappropriated at lease some portions of Bionix's ear curette business plan. In January 2005, Tillman had no experience in the manufacturing of medical devices, and Callaghan, the Tillman Industries ear curette designer, had no knowledge of ear curettes. Yet, despite this total lack of knowledge, they were able to secure a "committed customer" for ear curettes after meeting with a purchasing agent for a large medical provider. Then, about one month later, Tillman Industries created an extensive ear curette marketing plan which identified such items as: a market (general practitioners), a market lifecycle, a higher tech product (the lighted curette), product research ("our product enhancements"), product definition (including an adult and pediatric model), the competition (two markets -- disposable vs. non-disposable, identifying Bionix as the "market leader" with "many patents"), positioning ("a disposable curette with dual-purpose ends" provided at a low cost), communication strategies (targeting general practice, family practice, family clinics and VA clinics), product packaging (bulk packed 50-ct coated white boxes), and costing (use of polypropelene). *See* Ear Curette Marketing Plan.

Viewed in the light most favorable to the non-moving parties, the direct and circumstantial evidence indicates that plaintiffs acquired at least some portions of Bionix's ear

curette business plan. Accordingly, plaintiffs are not entitled to summary judgment with respect to defendants' counterclaim for misappropriation of the business plan.

### E.    The technical information

The record reflects that Bionix revealed certain technical information to Szyperski, Eddy and Heidenfeld, which included the elasticity and flexibility moduli and acceptable flash tolerances necessary to manufacture a plastic ear curette. Milligan testified that he communicated the "elastic modulis" of certain ear curettes to the Tech Group. Milligan Dep. at 69. In addition, Bionix revealed the flexibility and elasticity moduli and the flash tolerances of some ear curettes to the Tech Group. Huttner Aff. at ¶ 14. Huttner explained that Bionix disclosed the details of its plastic ear curettes because it was germane to the Tech Group's work on the lighted ear curette. Huttner Dep. at 48. None of this purported information, however, is actually contained in the affidavit or depositions.

The "formula" for the ear curette plastic could be a trade secret under § 445.1902(b)(i). *See, e.g., Felmlee v. Lockett*, 466 Pa. 1, 9-10, 351 A.2d 273 (1976) (chemical formula for soft plastic used to manufacture fishing lures is a trade secret; it was developed by appellees and not a matter of public knowledge); *Glucol Manufacturing Co. v. Schulist*, 239 Mich. 70, 75-76, 214 N.W. 152 (1927) (in holding that the formulae for making paste were trade secrets, the court noted that there is "good paste" and "bad paste"). Nevertheless, it is possible for a competitor to discover a trade secret by examining the products in the marketplace. "Trade secret law provides far weaker protection in many respects than patent law." *Kewanee Oil Co.*, 416 U.S. at 489-90 (footnote omitted). "While trade secret law does not forbid the discovery of the trade secret by fair and honest means, e.g., independent creation or reverse engineering, patent law

18

operates 'against the world,' forbidding any use of the invention for whatever purpose for a significant length of time." *Id.* at 490. Here, a question of fact exists as to whether Tillman Industries discovered the technical information by fair and honest means or by misappropriating the information from Bionix. Callaghan states that plaintiffs' ear curette was an independent creation that arose from his experience in the plastics industry, while defendants have presented evidence that it gave the technical information for plastic ear curettes to the Tech Group employees.

However, even if the technical information qualified as a trade secret under M.C.L. § 445.1902(b)(i), Bionix has failed to establish that it undertook "efforts that are reasonable under the circumstances to maintain its secrecy" under M.C.L. § 445.1902(b)(ii). Nothing in the evidence of record indicates that Bionix attempted to protect the secrecy of this technical information. This is primarily due to Bionix's refusal to identify the technical specifications (e.g., those pertaining to flexibility and elasticity moduili or the flash tolerances) that it claims are protected trade secrets. It has also failed to produce any written evidence that particular technical information was marked as confidential at the time of disclosure, nor has it produced any follow-up writing, made within 30 days of disclosure, confirming that disclosed but unmarked technical information was confidential. See Nonclosure Agreement at ¶ 8. Unlike the business plans, Bionix provides no e-mails or other documents containing such specific information. By failing to identify the technical trade secrets at issue, defendant cannot meet its burden of proving either the existence of the trade secrets or that it took reasonable efforts to protect them. Accordingly, plaintiffs are entitled to summary judgment on Bionix's counterclaim regarding the misappropriation of the "technical information" trade secret.

## V. Conclusion

For reasons stated above, plaintiffs' motion for summary judgment (docket no. 56) will be **GRANTED** as to defendants' second and third counterclaims for misappropriation of the technical information for producing a plastic ear curette and **DENIED** in all other respects.

An order consistent with this opinion shall be issued forthwith.


Dated:  March 13, 2008                              /s/ Hugh W. Brenneman, Jr.
                                                                            HUGH W. BRENNEMAN, JR.
                                                                            United States Magistrate Judge