UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VETERAN MEDICAL PRODUCTS, INC.,
*et al.*,

        Plaintiffs,

                              Case No. 1:05-cv-655

v.                                Hon. Hugh W. Brenneman, Jr.

BIONIX DEVELOPMENT CORPORATION,
*et al.*,

        Defendants.

_____/


**OPINION**

      This matter is now before the court on defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) (docket no. 122) and plaintiffs' motion for a finding that defendants' patent infringement counterclaim was an "exceptional case" warranting the award of attorneys fees pursuant to 35 U.S.C. § 285 (docket no. 119). Both motions will be granted.

    **I.**      **Background**

      Plaintiff Veteran Medical Products, Inc. ("Veteran Medical"), Tillman Industries, Inc.("Tillman Industries"), markets a plastic double-ended ear curette. On various occasions in September 2005, defendant Andrew J. Milligan ("Milligan"), the chief executive officer of defendant Bionix Development Corporation ("Bionix"), spoke with Veteran Medical personnel and accused that company of infringing Bionix's patent for a plastic ear curette, United States Patent No. D423,669 ("the '669 Patent"), and misappropriating trade secrets related to ear curettes. Trial

Trans. (April 15, 2008), docket no. 103, at pp. 62-72.[1]  On September 14th, Milligan left a telephone message at Classic Die, a supplier of tooling for Tillman Industries, which manufactured the ear curette for Veteran Medical, stating in pertinent part as follows:

> Hi . . . My name is Drew Milligan.  I'm the President of Bionics [sic] Corporation.  We need to talk about the manufacture of ear curettes that you apparently are providing tooling for a company named Tillman or Veteran Medical.  We've got a problem with that, and I just if I went to you and explained it, we would probably be able to clear it up before it goes any further.  That part you're making has been patented by us.  We've been in touch with the Tillman people and we're now going to federal court.  I don't want to necessarily name you in the suit.  That's why I thought I'd bring it to your attention before we went ahead and did that.  So if you would please, give me a call [phone numbers omitted].  I'd appreciate hearing from you rather quickly.  Thanks.  Bye now.

Trial exh. P125.[2]

Plaintiffs Veteran Medical and Tillman Industries, along with five individual employees of Tillman Industries, Joseph Szyperski ("Szyperski"), Patrick Eddy ("Eddy"), John Kotwick ("Kotwick"), Mark Longcore ("Longcore") and Ryan Heidenfeld ("Heidenfeld"), filed this action on September 23, 2005, alleging that defendants' conduct placed them under a reasonable apprehension of litigation relating the accused infringement of the '669 Patent.  In their complaint, plaintiffs sought a declaratory judgment that they did not infringe the '669 Patent and that they did not misappropriate trade secrets from defendants.  Compl. at ¶¶ 20-24.  Plaintiffs sought damages in three counts: federal unfair competition in violation of the Lanham Act, 16 U.S.C. § 1125(a)

---

[1] The trial transcript was prepared on an expedited basis.  At times, this resulted in multiple and overlapping transcripts for any given day of trial.  *See* docket nos. 98, 99, 100, 103, 109, 110, 111, 112, 120, 121, and 126.  In this opinion, the court will identify the trial transcripts as follows "Trial Trans. ("date"), docket no. __ at p. __".  Subsequent citations will appear as follows  "Docket no. __ at p. __".

[2] The court will identify trial exhibits as "Trial exh. __."

(sometimes referred to herein as "§ 43(a)"); violation of the Michigan common law of unfair competition; and tortious interference with business relationships. *Id.* at ¶¶ 25-30.

Defendants filed three counterclaims against plaintiffs. First, defendants alleged that plaintiffs infringed the '669 Patent. Second, defendants alleged that plaintiffs misappropriated Bionix's confidential and proprietary information and trade secrets in violation of Michigan law, and sought injunctive relief. Third, defendants alleged that plaintiffs' misappropriations were willful and malicious.

In March 2007, Veteran Medical obtained a patent for its own plastic double-ended ear curette.

On August 6, 2007, plaintiffs Kotwick and Longcore voluntarily dismissed their claims against defendants, and defendants voluntarily dismissed the counterclaims asserted against these two plaintiffs. *See* docket no. 55. On October 18, 2007, the court granted plaintiffs' count for declaratory judgment "to the extent that it seeks a declaration that the '669 Patent is not infringed by the plaintiffs," and further ordered "that the defendants' first counterclaim, which alleges infringement of the '669 Patent, and all relief sought in the counterclaim based thereon, is DISMISSED." *See* docket no. 74. Then, on March 13, 2008, the court granted plaintiffs' motion for summary judgment with respect to the second and third counterclaims, insofar as the counterclaims alleged that plaintiffs misappropriated technical information for producing a plastic ear curette. *See* docket nos. 76 and 77.

The jury trial in this matter commenced on April 15, 2008. At the close of plaintiff's case in chief, defendants moved for judgment as matter of law pursuant to Fed. R. Civ. P. 50(a)(1).[3] The court granted defendants' Rule 50 motion with respect to plaintiff's claim of tortious interference with a business relationship, which arose from defendant Milligan's telephone conversation with Classic Die, a supplier of Tillman Industries, in which Milligan advised Classic Die that a part it was making for "a company named Tillman or Veteran Medical" was patented by Bionix. Trial Trans. (April 18, 2008), docket no. 120 at p. 29; Trial exh. P 125. The court concluded that Classic Die was the only supplier identified by plaintiffs, and that there was "simply no evidence that the communication disrupted that relationship or that supplier." Docket no. 120 at p. 29. The court deferred ruling on defendants' claims with respect to the federal and state unfair competition claims. Defendants' renewed their Rule 50 motion at the close of all evidence. *Id.* at 252. The court did not grant defendants' motion , but noted that plaintiffs' proofs were "very thin." Trial Trans. (April 18, 2008), docket no. 121 at pp. 6-7.

The jury entered a verdict in favor of plaintiffs. After finding that defendant Bionix unfairly competed in the marketplace under both Federal and Michigan law, the jury awarded the following damages: Veteran Medical ($25,000.00); Tillman Industries (25,000.00); Szyperski ($16,500.00); Eddy ($16,500.00); and, Heidenfeld ($16,500.00). In addition, after finding that defendant Milligan unfairly competed in the marketplace under both Federal and Michigan law, the jury awarded the following damages: Veteran Medical ($25,000.00); Tillman Industries ($25,000.00); Szyperski ($16,500.00); Eddy ($16,500.00); and, Heidenfeld ($16,500.00). Finally,

---

[3] Rule 50(a)(1) allows the court to enter a judgment as a matter of law "[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."

the jury found that plaintiffs were not liable with respect to defendants' remaining counterclaims for misappropriation of trade secrets.

After the jury rendered its verdict, plaintiffs submitted a motion and brief in support of their claim for attorneys fees under 35 U.S.C. § 285 and defendants renewed their motion for judgment as a matter of law pursuant to 50(b). This opinion addresses both motions.

## II. Defendants' renewed motion for judgment as a matter of law

### A. Legal Standard

Fed. R. Civ. P. 50(b) allows a party to renew a motion for judgment as a matter of law after trial, providing as follows:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 10 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 10 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

In ruling on such a renewed motion, the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law. Rule 50(b).

"Judgment as a matter of law is appropriate when viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Tisdale v. Federal Express Corp.*, 415 F.3d 516, 527 (6th Cir. 2005) (internal quotation omitted). When faced with a motion for judgment as a matter of law, "a district court may not weigh the evidence or make credibility determinations, as these are jury functions." *Jackson v. Quanex Corp.*, 191 F.3d 647,

657 (6th Cir. 1999). A dismissal is improper if the non-moving party presented sufficient evidence to raise a material issue of fact for the jury. *Id.* "In other words, the decision to grant judgment as a matter of law or to take the case away from the jury is appropriate whenever there is a complete absence of pleading or proof on an issue material to the cause of action or when no disputed issues of fact exist such that reasonable minds would not differ." *Id.* (internal quotation omitted).

### B. Federal unfair competition claim (Lanham Act)

Plaintiffs' complaint alleged that defendants' statements made in September 2005 "constitute false or misleading representations of fact in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)" and that "[d]efendants wrongful conduct has been willful and was specifically undertaken for the purpose of injuring [p]laintiffs and benefiting [d]efendants." Compl. at ¶¶ 27-28. In their motion, defendants contend that plaintiffs failed to prove that defendants' acts caused any damages and that separate from the issue of damages, four of the plaintiffs (Tillman Industries, Szyperski, Eddy and Heidenfeld) lacked standing to bring an unfair competition claim under the Lanham Act.

Plaintiffs' Lanham Act claim fails because they presented no evidence that defendants caused damages by contacting a customer or potential customer of Veteran Medical with respect to the alleged patent infringement. The Lanham Act provides in pertinent part as follows:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another
> person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (emphasis added).

Plaintiffs argue that their Lanham Act claim sounds in "trade libel" or "product disparagement." *See* Plaintiffs' Oppos. to Rule 50(b) motion at p. 3 (docket no. 129). By way of background, the common law tort for disparagement of a competitor's product has been variously referred to as "commercial disparagement," "injurious falsehood," "product disparagement," "trade libel," "disparagement of property," or "slander of goods." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Vol. 5, §§ 27:94, 27:100 (4th ed. 2008). While there are many names for this tort, "all these labels denote the same basic legal claim." *Id.* at § 27:100.

Michigan common law recognizes this commercial disparagement tort as "injurious falsehood." *Sawabini v. Desenberg*, 143 Mich. App. 373, 383-84, 372 N.W.2d 559 (1985). The typical injurious falsehood case involves derogatory or disparaging communications regarding the title to property or its quality. *Kollenberg v. Ramirez*, 127 Mich. App. 345, 350-51, 339 N.W.2d 176 (1983). "The gist of the tort of injurious falsehood is some interference with an economically advantageous relationship which results in pecuniary loss ." *Id.* In *Neshewat v. Salem*, 173 F.3d 357 (6th Cir. 1999), the Sixth Circuit summarized the elements of Michigan's tort of injurious falsehood as follows:

> (1) that the defendant published a false statement to a third party knowing that
> statement to be false (or acting in reckless disregard for its truth or falsity); (2) that
> the defendant knew, or should have known, that this false publication would likely
> result in pecuniary loss or in harm to interests of the plaintiff having a pecuniary
> value; and (3) that the plaintiff suffered special damages as a result.

*Neshewat*, 173 F.3d at 364. The "special damages" suffered by a plaintiff must be pleaded and proved, and must include "loss of trade or other dealings." *Id.*; *Falls v. The Sporting News Publishing Co.*, 834 F.2d 611, 617 (6th Cir. 1987).

Prior to 1989, § 43(a) of the Lanham Act applied only to misrepresentations concerning one's own product. *See Kansas Bankers Surety Co. v. Bahr Consultants, Inc.*, 69 F. Supp.2d 1004, 1012, n. 12 (E.D. Tenn.1999); *McCarthy on Trademarks*, Vol. 5, §§ 27:6 - 27:10. Effective in 1989, the Lanham Act was amended to include claims of trade libel and disparagement of a competitor's product. *Id.*; *see also* Pub. L. 100-667, Title I & 132, 102 Stat. 3946, eff. Nov. 16, 1989. Thus, the Lanham Act now provides a vehicle for federal court assertion of trade libel claims. *McCarthy on Trademarks*, Vol. 5, § 27:10. This is included in § 1125(a)(1)(B), which forms the basis for plaintiffs' trade libel claim. See plaintiffs' opposition to defendants' Rule 50(b) motion (docket no. 129) at p.3.

Section 1125(a)(1)(B) forms the basis for what are generally known as "false advertising," "trade libel," and "product disparagement claims." *Zenith Electronics Corporation v. Exzec, Inc.*, 182 F.3d 1340, 1347-48 (Fed. Cir. 1999). *See Kansas Bankers Surety Co. v. Bahr Consultants, Inc.*, 69 F. Supp.2d 1004, 1012 (E.D. Tenn.1999) ("This section of the Act provides protection against a 'myriad of deceptive commercial practices,' including false advertising or promotion"), *citing Resource Developers v. Statue of Liberty-Ellis Island Found.*, 926 F.2d 134, 139 (2d Cir.1991).

To state a cause of action under § 1125(a)(1)(B) for "false advertising," "trade libel" or "product disparagement claims," a plaintiff must prove: (1) that the defendant made a false or misleading statement of fact in commercial advertising or promotion about the plaintiff's goods or

services; (2) that the statement actually deceives or is likely to deceive a substantial segment of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the defendant caused the statement to enter interstate commerce; and (5) that the statement results in actual or probable injury to the plaintiff. *Zenith Electronics Corporation*, 182 F.3d at 1348. Where, as in this case, the claim involves marketplace representations of patent infringement, the plaintiff must also demonstrate (6) that "the marketplace activity must have been undertaken in bad faith." *Id.* at 1353. The sixth requirement "is a function of the interaction between the Lanham Act and patent law, and is in addition to the elements required by § 43(a) itself, as § 43(a) alone does not require bad faith." *Id.* at 1354. *See, e.g., Genlyte Thomas Group LLC v. National Service Industries, Inc.*, 262 F. Supp.2d 753, 756 -757 (W.D. Ky. 2003) (listing the six *Zenith* factors).

Here, plaintiffs' Lanham Act claim for trade libel or product disparagement arose from statements made by Milligan and Bionix that the Veteran Medical ear curettes infringed on Bionix's '669 patent. A Lanham Act trade libel claim based upon patent infringement is not premised on the filing of patent infringement lawsuit, but rather is premised on statements made in the marketplace to the alleged infringer's customers or potential customers. *Zenith*, 182 F.3d at 1349. (e.g., a statement to potential customers of plaintiff that the plaintiff's product is infringing the defendant's patents and that the plaintiff is unable to design around the patents). *See IMCS, Inc. v. D.P. Technology Corp.*, 264 F. Supp.2d 193, 197 (E.D. Pa. 2003) ("[a] lawsuit that alleges unfair competition must be based on marketplace statements or misconduct and cannot be based merely on the filing of a lawsuit to enforce a presumptively valid patent"). While "the initiation of a patent infringement suit is clearly not covered by § 43(a) . . . a communication to the customers of the

accused infringer, in certain circumstances, may be." *Id. See e.g., Minebea Co., Ltd. v. Papst*, 13 F. Supp. 2d 35, 38-39 (D.D.C. 1998) ( a false patent infringement claim made by the defendant to the plaintiff's customers may violate § 1125(a)); *Laser Diode Array, Inc. v. Paradigm Lasers, Inc.*, 964 F. Supp. 90, 95 (W.D. N.Y. 1997) ("[t]here is case authority that allegations that a party falsely represented to a business's customers that the business was infringing on the party's patent rights will support [a Lanham Act claim]");

It is undisputed that in September 2005, Milligan made statements to Veteran Medical personnel, Tillman Industries employee Sean Callaghan, and Classic Die (a supplier of Tillman Industries) that the Veteran Medical plastic ear curette infringed upon the '669 Patent. However, plaintiffs presented no evidence that Milligan, or any other representative of Bionix, made a statement to an existing or potential customer of Veteran Medical regarding the alleged infringement of the '669 Patent. *See, Zenith*, 182 F.3d at 1348-49. Plaintiffs attempt to demonstrate the existence of such statements through the testimony of Sean Callaghan, a Tillman Industries employee who developed the market plan for Veteran Medical. Callaghan had some contact with a potential customer, Cardinal Health, as evidenced by a series of e-mails exchanged between Callaghan and Cardinal Health. However, these e-mails ceased in March 2005, some six months *before* Milligan made his statements in September 2005 regarding patent infringement, Trial Exh. P46, and Callaghan testified that Veteran Medical never did do business with Cardinal Health. Trial Trans. (April 15, 2008), docket no. 110, at p. 60.

Also, Milligan testified that he never called Cardinal Health about the patent infringement and that he did not have anyone from Bionix call Cardinal Health. Docket no. 103, at pp 73-74. There was no testimony to the contrary. Significantly, plaintiffs called no one from

Cardinal Health as a witness to provide any testimony about why Cardinal Health did not establish a relationship with Veteran Medical.

In short, there is simply no evidence that Milligan's statements to Classic Die and Veteran Medical personnel regarding the alleged patent infringement, made six months after Veteran Medical ceased discussions with Cardinal Health, affected Veteran Medical's relationship with that possible customer.

In the complete absence of any proof that defendants ever contacted Cardinal Health, or any other customer or potential customer of plaintiffs, there is no legally sufficient evidentiary basis for a reasonable jury to have found for plaintiffs on any of several material issues. Rule 50(a); s*ee Jackson*, 191 F.3d at 657. Plaintiffs have presented no evidence that defendants made any statements to a customer or potential customer of Veteran Medical in violation of the "trade libel" provision of the Lanham Act. In addition, there is no evidence that defendants' statements made to plaintiffs themselves, or to one of plaintiffs' own suppliers, regarding the '669 patent infringement affected Veteran Medical's relationship with any of its customers or potential customers. Thus, plaintiffs failed to adduce evidence that the defendants' statements actually deceived or were likely to deceive a substantial segment of plaintiffs' possible customer base (because the statements never reached that far), were material in influencing anyone's purchasing decisions, or resulted in actual or even probable injury to plaintiffs. *Zenith Electronics, supra,* at 1398. Accordingly, defendants' Rule 50(b) motion must be granted with respect to plaintiffs' federal unfair competition claim brought pursuant to the Act.[4]

---

[4] Because the court agrees with defendant that necessary elements of plaintiffs' Lanham Act claim are unsupported by any evidence, it is unnecessary for the court to further address the issue of standing.

### C.     Plaintiffs' standing under Michigan law

### 1.     Unfair Competition Claim

In order to determine whether each plaintiff has standing to bring an unfair competition claim under Michigan common law, the court must determine the elements of the claim asserted against defendants.[5]  Plaintiffs' claim arises from defendants' statements to Classic Die, employee Callaghan and Veteran Medical, that Veteran Medical's ear curettes infringed on Bionix's '669 patent.   As previously discussed, plaintiffs brought a federal trade libel or product disparagement claim under the Lanham Act.   However, plaintiffs did not plead or seek a jury instruction for Michigan's common law version of that tort, i.e., injurious falsehood.  *See Neshewat*, 173 F.3d at 364.; *Sawabini*, 143 Mich. App. at 383-84;  *Kollenberg*, 127 Mich. App. at 350-51.  Rather, they chose to sue defendants under the broad umbrella of "unfair competition."

Plaintiff's claim arising from Milligan's and Bionix's actions does not fit neatly within Michigan's common law of unfair competition.  *See Schwannecke v. Genesee Coal & Ice Co.*, 262 Mich. 624, 627, 247 N.W. 761 (1933) ("[u]nfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person for those of

---

[5] Defendants rely on *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 833 (6th Cir. 1983), for the proposition that the Lanham Act and Michigan state law unfair competition claims are governed by the same standards.  Defendants' Brief at 11. The court disagrees.  *Carson* addressed the issue of whether the defendant could use a phrase generally associated with a popular entertainer.  *Carson*, 698 F.2d at 832.   The Sixth Circuit did not make any broad statement regarding Michigan's common law of unfair competition, but merely agreed with the district court that the test for equitable relief under both the Lanham Act and Michigan common law in the particular dispute at issue was the "likelihood of confusion" standard.  *Carson*, 698 F.2d at 833.

In their response to defendants' motion, plaintiffs limit their discussion to the Lanham Act, and do not address their standing to bring a common law unfair competition claim.

another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor"); *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*, 338 F. Supp. 762, 767 (E.D. Mich. 1972) ("[d]ecisions of Michigan courts involving claims of unfair competition have been limited almost exclusively to the protection of names of corporations, buildings, and other businesses").

The gist of an unfair competition case is that the public is so misled that the plaintiff loses some trade by reason of the defendant's deception. *Revlon, Inc. v. Regal Pharmacy, Inc.*, 29 F.R.D. 169, 174 (E.D. Mich. 1961). Common law unfair competition also requires the deception and confusion of the public:

> In order to make out a case of unfair competition, it is not necessary to show that any person has been actually deceived by defendant's conduct . . . It is sufficient to show that such deception will be the natural and probable result of defendant's acts. *But either actual or probable* deception and confusion must be shown, for if there is no probability of deception, there is no unfair competition. In close cases, where the deceptive tendency is not clear, equity will withhold its hand until actual deception has resulted.

*Weisman v. Kuschewski*, 243 Mich. 223, 228-229, 219 N.W. 937 (1928) (internal quotation marks omitted). More recently, the Michigan Court of Appeals summarized the general principles of common law unfair competition as follows:

> Michigan's common law of unfair competition prohibits unfair and unethical trade practices that are harmful to one's competitors . . . The term *unfair competition* may encompass any conduct that is fraudulent or deceptive and tends to mislead the public.

*ATCO Industries, Inc. v. Sentek Corporation*, Nos. 232055, 235398, 2003 WL 21582962 at *3 (Mich. App. July 10, 2003) (unpublished decision), *citing* Pappas and Steiger, *Michigan Business Torts*, pp. 60-62) (emphasis in original). Given the different types of unfair competition, the Michigan Supreme Court has determined that "[e]ach case is determined upon its own facts and

relief is based upon the principles of common business integrity." *Good Housekeeping Shop v. Smitter*, 254 Mich. 592, 596, 236 N.W. 872 (1931).

In this instance, plaintiffs' unfair competition claim was premised on an allegation of corporate defamation as the unfair trade practice at issue. Although plaintiffs do not label it as such, their claim of corporate defamation is clearly set forth in the parties' stipulated jury instruction, which reads as follows:

> Plaintiffs also claim that defendants have violated a Michigan law that prohibits a person or company from unfairly competing with another by making false or misleading statements. Under Michigan law, a party must prove the following elements to win an unfair competition case of this sort in Michigan:
>
> 1.    the defendants made a false statement;
>
> 2.    that caused actual or imminent injury by prejudicing the plaintiffs in the conduct of its business or by deterring others from dealing with the plaintiffs.

Trial Trans. (April 18, 2008), docket no. 121, at p. 81; Docket no. 88, Stipulated proposed jury instruction no. 24.

This instruction was derived from *ATCO Industries, Inc.* (an unfair competition case) and *Heritage Optical Center, Inc. v. Levine*, 137 Mich. App. 793, 359 N.W.2d 210 (1984) (a corporate defamation tort case). *Id.* In *Heritage Optical Center, Inc.*, the court set forth the elements of the commercial tort of corporate defamation as follows:

> One who publishes defamatory matter concerning a corporation is subject to liability to it
>
> > (a) if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it, or

(b) if, although not for profit, it depends upon financial support from the public, and the matter tends to interfere with its activities by prejudicing it in public estimation.

*Heritage Optical Center, Inc.*, 137 Mich. App. at 797-798, quoting Restatement Torts, 2d, § 561, p. 519.

"[L]anguage which casts an aspersion upon [a corporation's] honesty, credit, efficiency or other business character may be actionable." *Heritage Optical Center, Inc.*, 137 Mich. App. at 798, *quoting* Prosser, *Torts* (4th ed.), § 111, p. 745. For example, a defendant's statements to plaintiff corporation's clients that plaintiff was insolvent and no longer capable of performing services constituted slander *per se*. *Heritage Optical Center, Inc.*, 137 Mich. App. at 795-98. "[W]here a libel contains an imputation upon a corporation in respect to its business, its ability to do business, and its methods of doing business, the same becomes libelous per se." *Id.* at 798 (citations omitted). In the case of corporation defamation *per se*, special damages need not be alleged or proven. *Id.* at 797. As with any case of defamation, the defamatory statement must refer to the plaintiff corporation. *LBI Investments, Inc. v. Lexington Intern., LLC*, No. 05-74387, 2007 WL 1013011 at *4 (E.D. Mich. March 30, 2007), *citing Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 197 Mich. App. 48, 51, 495 N.W.2d 392 (1992).

An unfair competition claim in Michigan, however, does require that the plaintiff be in competition with the defendant. "[I]n order to prove unfair competition there must be actual competition shown from specific instances or as a natural tendency of defendant's act," *Burns v. Schotz*, 343 Mich. 153, 157, 72 N.W.2d 149 (1955), *citing Good Housekeeping Shop*, 254 Mich.

at 596. "[O]ne simply cannot be found guilty of unfair competition when the facts indicate no competition." *Boron Oil Company v. Callanan*, 50 Mich. App. 580, 583, 213 N.W.2d 836 (1973).[6]

In this case, there is no evidence that plaintiffs Tillman Industries, Szyperski, Eddy or Heidenfeld were in "actual competition" with defendants. It is undisputed that Veteran Medical was the entity that sold plastic ear curettes in competition with Bionix. Veteran Medical designed and marketed medical and disposable products such as the ear curettes, amniotic membrane perforators, and urine sample cups. Trial Trans. (April 14, 2008), docket no. 100, at p. 23. Ultimately, it obtained the patent for the ear curettes.

On the other hand, Tillman Industries, a separate entity, was a contract manufacturer for the health care industry that provided injection molding and assembly services. *Id.* at pp. 5-6. Tillman Industries was a supplier that did not sell any of its own products. *Id.* at 6. Tillman Industries produced the ear curettes for Veteran Medical. Trial Trans. (April 14, 2008), docket no. 99, at p. 3; Docket no. 110, at pp. 24-25. Szyperski, Eddy and Heidenfeld worked for Tillman Industries - not Veteran Medical. Docket no. 100, at pp. 36-37; Docket no. 103, at p. 22; Trial Trans. (April 16, 2008), docket no. 111, at pp. 27-28, 71. The evidence does not show any of these four plaintiffs were in competition with Bionix.

Moreover, even if the three individual employees had worked for Veteran Medical (rather than Tillman Industries), they could not file a legal action to enforce an unfair competition claim on behalf of their employer corporation. *Warren v. Manufacturers Nat. Bank of Detroit,* 259 F.2d 542 (6th Cir. 1985); *see Michigan Nat. Bank v. Mudgett*, 178 Mich. App. 677, 679, 444 N.W.2d

---

[6] One exception to this rule is when a widely known name, made valuable by the owner, is pirated. *Boron Oil Company*, 50 Mich. App. at 583. However, this exception does not apply to the present case; there is no allegation that defendants pirated any of the plaintiffs' names.

534 (1989) ("[i]n general, a suit to enforce corporate rights or to redress or prevent injury to the corporation, whether arising out of contract or tort, must be brought in the name of the corporation and not that of a stockholder, officer or employee") (citations omitted).

Accordingly, the court agrees with defendants that plaintiffs Tillman Industries, Szyperski, Eddy and Heidenfeld did not have standing to bring the Michigan unfair competition claim against defendants.

### 2.    Purported Defamation of Individual Plaintiffs

Next, Szyperski, Eddy and Heidenfeld contend that this action is one sounding in defamation and slander regarding their individual reputations, businesses or professions. The individual plaintiffs rely on *Haney Mfg. v. Perkins*, 78 Mich. 1, 43 N.W. 1073 (1889) for the proposition that "[w]ords spoken or written injurious to a person in his business, and false and malicious, are actionable *per se*, and special damages need not be proved." *Haney Mfg. Co.*, 78 Mich. at 10.  The claim referred to in *Haney* was for libel or slander. This contention is without merit in the context of this lawsuit, where there has been a complete absence of pleading or proof of such claims.

First, plaintiffs did not file separate counts for libel, slander or defamation, and this lawsuit never involved a libel or slander action by Szyperski, Eddy or Heidenfeld. Plaintiffs never pled such counts in their complaint nor requested jury instructions for these non-commercial torts.

Second, even if the individual plaintiffs had properly alleged defamation against them as individuals, there is no evidence that defendants made any defamatory statement against them as

individuals. A defamatory statement must refer to the plaintiff alleging defamation. *Royal Palace Homes, Inc.*, 197 Mich. App. at 51.[7]

For these reasons, the court rejects the individual plaintiffs' contention that a reasonable jury could enter a verdict in their favor for libel, slander or defamation of their personal reputations.

### 3.    Summary

Defendant Bionix's Rule 50(b) motion will be granted on the issue of standing under the Michigan Unfair Competition claim with respect plaintiffs Tillman Industries, Inc., Szyperski, Eddy and Heidenfeld.

### D.    Damages

It is undisputed that Milligan made a statement to a third-party, Classic Die, to the effect that Veteran Medical's product was infringing Bionix's patent. Since Veteran medical was not, in fact, infringing, this evidence supports Veteran Medical's common law unfair competition claim arising from corporate defamation. Because the type of unfair competition in this case, i.e., corporate defamation, does not require a plaintiff to plead or prove special damages, Veteran Medical did not need to establish the <u>fact</u> of damages as an element of its unfair competition claim. Such an element is normally a prerequisite to establishing a claim of unfair competition in Michigan. *Zirin Laboratories Intern., Inc. v. Mead-Johnson & Co.*, 208 F. Supp. 633, 635 (E.D. Mich. 1962). However, it was still necessary for Veteran Medical to establish the <u>amount</u> of damages suffered as a result of the unfair

---

[7]Moreover, two of the three individual plaintiffs failed to offer evidence of any loss or damage he suffered personally. The third individual plaintiff, Szyperski, testified he was concerned for his reputation because of what had been said about the two companies. Conjecture about one's reputation in one's own mind cannot constitute a legally sufficient basis for determining damages, much less quantifying those damages with any reasonable certainty.

competition to obtain a monetary recovery. The remaining issue raised by defendants Milligan and Bionix is whether they are entitled to a judgment as a matter of law with respect to the $25,000.00 verdict awarded against each of them and in favor of Veteran Medical for engaging in unfair competition under Michigan law. The crux of defendants' claim here is that Veteran Medical presented no proofs to support the amount of damages awarded by the jury. The court agrees.

### 1.    Legal standard

"Damages for infringement or unfair competition . . . must be confined to the loss actually sustained by plaintiff as the direct and natural consequence of such acts, and damages which are uncertain or speculative cannot form the basis of a recovery." *See Liberty Oil Corp. v. Crowley, Milner & Co.*, 270 Mich. 187, 196, 258 N.W. 241 (1935). *See Socony-Vacuum Oil Co. v. Rosen*, 108 F.2d 632, 636 (6th Cir. 1940) (applying the measure of damages as set forth in *Liberty Oil Corp.*); *Coca-Cola Co. v. Christopher*, 37 F. Supp. 216, 217 (E.D. Mich. 1941) (same); *Ren v. Philip Morris Inc.*, No. 00-004035 CZ, 2002 WL 1839983 at *17 (Mich. Cir. Ct. June 11, 2002) (plaintiff in Michigan unfair competition action is limited to actual damages, citing *Socony-Vacuum Oil Co.*). A plaintiff is entitled to the profits he might have realized if not for the unfair competition. *Skimin v. Fuelgas Co.*, 339 Mich. 523, 530, 64 N.W.2d 666 (1954) (in the case of a sales contract that was breached due to unfair competition, the plaintiff is entitled to lost profits on that contract). *See, also, Liberty Oil Corp.*, 270 Mich. at 194 (a defendant which sold lubricating oil bearing the plaintiff's trademark, after being advised of trademark infringement, was liable for the profits it received on such sales and any damages sustained by the plaintiff). In an unfair competition case, "it is well-established that a plaintiff is not entitled to an award of damages unless both the fact of damage and the amount of damage are established with reasonable certainty; neither may properly

be based upon mere speculation, guess, or conjecture." *Zirin Laboratories,* 2008 F.Supp. at 635. Nevertheless, the fact that the amount of damages suffered by a victim of unfair competition cannot be measured easily, with mathematical certainty or with absolute accuracy is not a ground for denying them. *Skimin*, 339 Mich. at 530-31.

Defendants' motion also appears to incorporate a request for remittitur on the ground that Veteran Medical failed to present any evidence that it suffered any lost profits or other damage from Bionix's unfair competition.

> This Circuit has determined a jury verdict should not be remitted by a court unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss. As we have held, an award must stand unless it is (1) beyond the range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake.

*Gregory v. Shelby County, Tennessee*, 220 F.3d 433, 443 (6th Cir. 2000) (citations and quotation marks omitted). "A trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." *Id.*

### 2. Evidence

There was a dearth of evidence from which the amount of damages could be determined in this case.

Roosevelt Tillman, an owner of Veteran Medical, testified that Veteran Medical's total sales of ear curettes through the date of trial (April 2008) was "about $30,000.00." Docket no. 100, at pp. 5, 65-66. There was no evidence regarding the number of boxes of ear curettes actually

sold by Veteran Medical, and plaintiffs presented no actual sales history or cost analysis from which the jury could have determined lost profits based upon those sales.

Sean Callaghan testified that he first met with Roosevelt Tillman during the summer of 2004 and that by January 2005, had discussed producing plastic medical equipment with both Tillman and personnel at Spectrum Health. Docket no. 99, at pp. 8, 11, 17-18. Although he had no experience in manufacturing ear curettes, Callaghan developed a marketing plan for ear curettes on or about February 23, 2005. Docket no. 110, at pp. 83-84, 90. In the absence of any production or sales history for the plaintiff company (none existed), Callaghan testified that they had a first year goal of sales "ramping up to 250 boxes per month." *Id.* at 49-50, 83-84. The marketing plan indicated that the sales price could range anywhere from $33.95 to $50.75 for a 50 curette box. Trial exh. P108 at 8. The marketing strategy listed as possible customers VA clinics, the Department of Defense (DOD) and the General Services Administration (GSA). *Id.* There was no evidence, however, that any of these agencies had actually been contacted. The marketing plan was nothing more than speculation, and vague guesswork at that.

When asked "[w]here did you get the information that you thought you would be able to ramp up to 250 boxes per month," Callaghan gave the following reply:

> Based on just talking to people, whether at Spectrum, Saint Mary's, I mean those were, you know, easy sells for us. The Cardinal data, looking at what's out there, and then also the price points. I mean one of the things that we did , because we actually make the product in a sense and have a cost, and looking at the various sell prices of the stuff and, you know, it's in the news all the time about how high medical prices are and that kind of stuff. We said, you know, another thing we could add is not just going to do this, but let's save people money. So our thought was based on the market out there, based on our price points, we should easily be able to, you know, start selling that many and then go up from there.

Docket no. 110, at p. 50. On cross-examination, Callaghan admitted that he had no experience in manufacturing ear curettes when he prepared the market plan. *Id.* at 90. Such testimony provides no basis for a factual finding.

Veteran Medical never did business with Cardinal Health. Docket no. 110 at p. 60. Mr. Callaghan testified that while they had "[a] lot of communication at the start . . . it's been a long time since I talked to Cardinal Health." *Id.* at 60-61. When asked for an estimation of the amount of business that Veteran Medical could have done with Cardinal Health, Mr. Callaghan testified:

> Well, in the early days when we were talking to Cardinal and there was a lot of energy, we kind of figured probably be able to do at least half of our business plan with them because they're a multi-billion dollar corporation that moves a lot of ear curettes.

*Id.* at 62-63.

In closing argument, plaintiffs' counsel asked the jury for damages based upon the gross profits that Bionix would have received from selling 125 boxes per month of ear curettes:

> We saw in the marketing plan that based on Cardinal's representations and Spectrum Information, Veteran Medical was planning on selling 250 boxes a month, at least that's what they were going to ramp up to. There's also testimony from Sean Callaghan that one-half of those sales were likely to go to Cardinal Health. So that leaves -- that's 125 boxes per month.
>
> Now, underneath that, we multiply that by $89.50. Where does that number come from? That number comes from Bionix. And the reason we use Bionix's number -- and it's based on Dr. Milligan's testimony of how much these ear curettes were sold for -- is that 89.50 is the amount of a box of Bionix, and we're using the measure of Bionix's profits.
>
> Now, Bionix came back with no information to say, "Here's how much cost we have, here's how much our overhead is["], so that's the measure that needs to be used, is the sales price, which is 89.50[ ] -- we have been in this case 30 months -- for a total of $298,000. That's the amount of money that Veteran Medical and Tillman Industries have lost because Dr. Milligan and Bionix went out and unfairly competed by accusing them of patent design infringement.

Trial Trans. (April 18, 2008), docket no. 121 at pp. 37-38.

As an initial matter, the court notes that the pricing figure used by plaintiff's counsel in closing argument appears to have come out of thin air. It is not supported by any evidence introduced at trial. Milligan testified that Bionix's "safe ear curette" (the comparable ear curette to the Veteran Medical ear curette) sold for a retail price of $0.84 apiece. Docket no. 103 at p. 41. Based on this retail price, a box of 50 of safe ear curettes would sell for $42.00, not $89.50.[8] The $89.50 figure referenced by plaintiffs' counsel in closing argument was more than twice the selling price for Bionix's safe ear curette. If plaintiffs' counsel sought to use the price of a 50-unit box of the safe ear curette per Milligan's testimony ($42.00), then the requested damages would be reduced from the requested $298,000.00 to $157,500.00 (i.e., $42.00 x 125 x 30 = $157,500.00).

In their response to defendants' Rule 50(b) motion, plaintiffs have changed their argument in support of damages. They have abandoned reliance upon Milligan's testimony, and instead have utilized Bionix's advertised retail price of $44.50 per box, a figure derived from a Bionix price list for the safe ear curettes. *See* Trial exh. P60. Using this figure, plaintiffs have now adjusted their "lost sales" downward from $298,000.00 to $166,875.00. Plaintiffs' Opp. at p. 8.[9] Unexplainedly, plaintiffs have not sought to use the sale price of their own product, $34.95 for a box of 50 ear curettes, as a starting point for their calculation, a figure that would seem much more relevant. This price was listed on Veteran Medical's website.

---

[8] Milligan testified that a more technically advanced lighted ear curette, which attached to a power source, was sold in boxes of 50 for $79.50. Trial Trans. (April 16, 2008), docket no. 109, at pp. 8-9.

[9] While the $44.50 per box figure is contained in an exhibit, this number was never argued to the jury and was clearly not the number the jury relied upon.

However, whether plaintiffs use their own sales price, or the higher sales price Bionix charged, they have failed to introduce any evidence of the cost of producing and marketing either product. Therefore, no lost profit per box can be computed from either of these numbers. Any loss profit figure per box or per curette would be entirely conjectural on this record and none has been offered. As the party bringing this state claim, the burden of proving its lost profits was on the plaintiffs.[10]

Evidence of the number of lost sales in terms of individual curettes, or boxes of curettes, is equally conjectural on this record. Defendant's statements, made only to a supplier of plaintiff Veteran Medical's own product supplier, and to plaintiff's employee, and made six months after plaintiff stopped talking to a possible customer (Cardinal Health) with whom it had never done and never would do business, provide entirely too conjectural a basis to support any claim plaintiff would have done business with Cardinal Health. It is even more conjectural to say the plaintiffs would have made sales of $166,875.00, as belatedly now estimated by plaintiff. Indeed, not only is there no direct evidence of such a sales loss, there is not even a rational basis for drawing such an inference, where the wrongful statements were first made six months _after_ plaintiff and Cardinal Health stopped talking to each other, rather than before they stopped talking (and where the statements in question were never made to Cardinal Health, or any other potential customer, in any event).

---

[10]It appears plaintiffs attempted to rely on 15 U.S.C. 1117(a) of the Lanham Act, which only requires a plaintiff to prove a defendant's sales, and places the burden of proving all costs and deductions on the defendant. This provision, however, was not applicable to the state common law claim. *Cf. Cooper Indus. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 430 n.3 (2001) (recovery provisions of 15 U.S.C. 1117(a) cannot be supported, in action alleging both Lanham Act claim and state-law claim of unfair competition, unless the federal law has been violated).

Nor, for all the same reasons, can plaintiffs simply adopt defendant Bionix's entire gross sales during the relevant period as their own, and claim that amount as their lost profits.

After reviewing the trial transcript and exhibits, the court concludes that there is an absence of proof from which a jury could even begin to calculate the amount of any loss. At most, the testimony established that Veteran Medical, new to the ear curette market, hoped to develop Cardinal Health and other customers to purchase ear curettes, hoped to "ramp up" its production during the first full year of operation to 250 boxes of curettes per month, hoped to sell one-half of that production to Cardinal Health, and hoped to sell the other half of the production to someone else, possibly VA clinics, the DOD or the GSA. Plaintiffs belatedly contend the sale price of one of their boxes should be calculated at $42.00, although they were actually selling for $34.95, and all these calculations are devoid of any considerations of cost. While plaintiffs' damages do not need to be measured with mathematical certainty, *Skimin*, 339 Mich. at 530-31, the amount of damage need to be established with <u>reasonable</u> <u>certainty</u>. *Zirin Laboratories Intern., Inc.*, 208 F. Supp. at 635. Here, the evidence at trial regarding Veteran Medical's sales of ear curettes, much less than any evidence of lost profits, was based on nothing more than hope, guesswork and speculation rather than a reasonably certain measure of damages actually suffered by Veteran Medical.

In their response to the Rule 50(b) motion, plaintiffs contend that their damages may be presumed, as in a defamation case. While this may be so, the <u>amount</u> of damages cannot be presumed. The court finds Veteran Medical to be the prevailing party on this rather unique claim of corporate defamation constituting unfair competition, but finds no evidence from which a reasonable jury could begin to determine any amount of actual damages with reasonable certainty. *See Liberty Oil Corp.*, 270 Mich. at 196.

For the reasons stated above, the jury's multiple awards of $25,000.00 against both Bionix and Milligan are "beyond the range supportable by proof," *Gregory*, 220 F.3d at 443, and the court is constrained to set them aside.

## II.     Plaintiffs' motion for attorney fees

Next, the court will address plaintiffs' motion for a finding that defendants' patent infringement counterclaim was an "exceptional case" warranting the award of attorneys fees pursuant to 35 U.S.C. § 285.

### A.     Background

As discussed at the outset of this opinion, Andrew Milligan, CEO of Bionix, had several discussions with Veteran Medical personnel in September 2005 concerning Bionix's accusation that Veteran Medical was infringing Bionix's '669 design patent for its double-ended plastic ear curette.[11]

In a letter to Sean Callaghan at Veteran Medical, dated September 20, 2005, Milligan expressed his understanding that Veteran Medical would cease producing ear curettes, requested the entry of a consent judgment and an injunction, and threatened to file suit for patent infringement and misappropriation of trade secrets if a response was not received by September 26, 2005. *See* docket no. 6-3. Three days later, on September 23, 2005, plaintiffs filed the present complaint seeking, among other relief, a declaratory judgment that they did not infringe on the '669 patent. On October 4, 2005, Bionix filed a federal action against plaintiffs in the Northern District of Ohio,

---

[11]There has been no assertion by any of the parties to this action that the concept of a double-ended ear curette was itself new. A double-ended curette was patented by another company back in 1927. Trial exh. P251. Rather, the question in this case has been one of design.

alleging patent infringement and misappropriation of trade secrets.  *See* docket no. 6-4.  Plaintiffs applied for their own patent on October 28, 2005.  Trial exh. P24.

On November 3, 2005, defendants in this action moved to dismiss plaintiffs' complaint on the ground that they had filed an action against plaintiffs in the Northen District of Ohio.  *See* docket nos. 5, 6.  This court denied the motion on September 14, 2006, *see* docket nos. 13 and 14, and on October 13, 2006, defendants filed a counterclaim in this court against plaintiffs for design infringement of the '669 patent.  *See* docket no. 17, Counterclaim at ¶¶ 39-45.

In their counterclaim, defendants alleged that the '669 patent, "for disposable ear curettes for aural examination," was issued by the United States Patent and Trademark Office ("PTO") on April 25, 2000, for a term of 14 years.  *Id.* at ¶ 39.  Defendants alleged that plaintiffs offered infringing products for sale, as identified both in literature and at Veteran Medical's website. *Id.* at ¶ 42; Exhs. B and C.  On the www.veteranmedical.com website, Veteran Medical offered the "Clear Ear" disposable ear curette at a price of $34.95 per box of 50.  *Id.* at Exh. C.  Bionix alleged that these ear curettes infringed the '669 patent, that the infringement was willful, and that the infringement would cause irreparable harm  "[b]ecause of the unique ornamental appearance of Bionix's patented design."  *Id.* at ¶¶ 43-45.  For these reasons Bionix alleged that it was entitled to injunctive relief and monetary damages pursuant to 35 U.S.C. §§ 271 and 289.  *Id.* at ¶ 43.  *See Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1117 (Fed. Cir. 1998) ("[i]nfringement of a design patent is the unauthorized manufacture, use, or sale of the article embodying the patented design or any colorable imitation thereof").

The "statement of the case" in parties' joint status report, filed on November 13, 2006, pursuant to Fed. R. Civ. P. 16, characterized this litigation as primarily one for infringement of the '669 patent:

> This case involves the alleged infringement of U.S. Design Patent No. D423,669, that is directed to an ear curette, which issued on April 25, 2000, to Bionix Development Corporation. It further involves threats to the Plaintiffs to file suit for the alleged infringement of that patent, and contacts by Bionix and its president, Andrew Milligan, to Classic Die, a supplier of tooling to Plaintiff Veteran, during which statements alleged to be false were made. These statements may be a violation of federal law under § 43 of the Lanham Act, Michigan Common Law, and are a tortious interference with Plaintiffs' business relationships. Defendants deny these claims and filed counterclaims that Plaintiffs have infringed Design Patent No. D423,669, and that Plaintiffs have misappropriated Bionix's confidential and proprietary information and trade secrets, which were allegedly communicated to the prior employer of certain individual Plaintiffs under a confidentiality agreement. Bionix contends that its ear curette product, its manufacturing technique, the costs of such technique, and its trade dress were all misappropriated when Plaintiffs left their former employer, and began to manufacture competing curettes. (emphasis added)

*See* docket no. 23, ¶ 5.

On March 27, 2007, the PTO issued patent no. D539,426 (the '426 patent) to Veteran Medical for its plastic ear curette. Trial exh. P24. Several months later, on August 8, 2007, plaintiffs filed a motion for summary judgment on the patent infringement counterclaim, on the ground that an ordinary observer would not be deceived into believing that the Veteran Medical ear curette was the same as Bionix's patented design (i.e., the "ordinary observer" test), and that the only alleged novelty was found in the prior art (i.e., the "point of novelty" test). *See* docket nos. 56, 58. In support of their motion, plaintiffs cited *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1377 (Fed. Cir. 2002), which held that in determining design infringement, comparison to the accused product included two distinct tests, both of which must be satisfied in order to find infringement: (a) the "ordinary observer" test, and (b) the "point of novelty" test. Under the

"ordinary observer" test, "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Contessa Food Products*, 282 F.3d at 1377, *quoting Gorham Company v. White*, 81 U.S. (14 Wall.) 511, 528 (1871). "The 'point of novelty' test is distinct from the 'ordinary observer' test and requires proof that the accused design appropriates the novelty which distinguishes the patented design from the prior art. *Contessa Food Products*, 282 F.3d at 1377.[12]

Despite filing a patent infringement action in the Northern District of Ohio, filing a patent infringement counterclaim in this action, and characterizing the alleged patent infringement as central issue in this action, it was not until September 12, 2007 that defendants ultimately conceded, without argument, plaintiffs' motion for summary judgment on the patent infringement issue. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment. On October 18, 2007, the day after holding a *Markman* hearing and a hearing on the motion for summary judgment, the court noted that the parties agreed that plaintiffs did not infringe the '669 design patent, and entered an order granting plaintiffs' request for a declaratory judgment to the extent that the '669 patent was not infringed by them and dismissing defendants' first counterclaim, which alleged infringement of the patent. *See* docket no. 74.

---

[12] The court notes that after the conclusion of this trial, in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (*en banc*), *pet. cert. filed* No. 08-1031 (Feb. 2, 2009), the Federal Circuit abrogated the two-pronged approach for deciding a design infringement claim set forth in *Contessa Food Products*, holding that the "ordinary observer" test should be the sole test for determining whether a design patent has been infringed, and that the "point of novelty" test should no longer be used.

### B.       Discussion

Pursuant to 35 U.S.C. § 285, the court may, "in exceptional cases,"award reasonable attorney fees to the prevailing party. The purpose of section 285 is to provide the district court with discretion to award fees where it would be grossly unjust that the winner be left to bear the burden of his own costs of counsel which prevailing litigants normally bear. *Badalamenti v. Dunham's, Inc.*, 896 F.2d 1359, 1364 (Fed. Cir. 1990). "The finding of 'exceptional case' is one of fact, and must be made in the first instance by the district court." *Id.*

The court's decision of whether to award attorney fees under § 285 involves a two-step process. *Forest Laboratories, Inc. v. Abbott Laboratories*, 339 F.3d 1324, 1327 (Fed. Cir. 2003). "First, a district court must determine whether the prevailing party has proved by clear and convincing evidence that the case is 'exceptional' . . . Second, if the district court finds the case to be exceptional, it must then determine whether an award of attorney fees is appropriate." *Id.* at 1327-28.[13]

Exceptional cases usually involve material and inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, or conduct that violates Fed. R. Civ. P. 11. *Serio-US Industries, Inc. v. Plastic Recovery Technologies Corp.*, 459 F.3d 1311, 1321-22 (Fed. Cir. 2006). "Absent misconduct in the litigation or in securing the patent, a trial court may only sanction the patentee if both the litigation is brought in subjective bad faith and the

---

[13]"[T]he district court may reweigh evidence in deciding whether the case is exceptional so long as the court's findings do not conflict with the jury's findings." *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1314 (Fed. Cir. 2001). Since the patent infringement claim giving rise to these attorney fees was dismissed prior to trial, there were no jury findings on this issue.

litigation is objectively baseless." *Id.* at 1322, *citing Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993). "Bad faith" is exhibited by "vexatious, unjustified, or frivolous litigation." *Forest Laboratories, Inc.*, 339 F.3d at 1329-30. An allegation of patent infringement is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008), *cert. den.* 77 USLW 3413 (2009) , *quoting Professional Real Estate Investors*, 508 U.S. at 60. The issue of frivolousness under § 285 is determined at the time suit was filed and throughout the time it was maintained. *Haynes International, Inc. v. Jessop Steel Co.*, 9 F.3d 1573, 1580 (Fed. Cir. 1993)

There is a presumption that asserting the infringement of a duly granted patent is made in good faith. *Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*, 393 F.3d 1378, 1382 (Fed. Cir. 2005). A party is not liable for vigorously prosecuting or enforcing a presumptively valid patent. *McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1372 (Fed. Cir. 2003). "Thus, the underlying improper conduct and the characterization of the case as exceptional must be established by clear and convincing evidence." *Brooks Furniture Manufacturing, Inc.*, 393 F.3d at 1382. The burden is on the movant to show that the party accusing patent infringement knew or should have known that it lacked a legal basis for its suit. *Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1367-68 (Fed. Cir. 2007). *See Haynes International, Inc.*, 9 F.3d at 1579 ("[a] frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known, was baseless"). When an accused infringer prevails in the underlying action, factors relevant to the "exceptional case" inquiry include the closeness of the question, pre-filing investigation and discussions with the defendant, and litigation behavior. *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1379 (Fed. Cir. 2008).

In this case, it appears to the court that defendants' infringement suit was baseless and brought in bad faith. The patent-in-suit is for the ornamental design of a double-ended plastic ear curette. Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment at 3. The court begins by noting the startling differences between the handle design of the Veteran Medical "Clear ear" curettes and the Bionix Safe ear curettes. *Compare* Trial exhs. P24 and P27-29 *with* P15 and P30-36. The Veteran Medical curettes have an hourglass-shaped, ribbed handle, that is flat on one side. The Bionix curettes have a straight, elongated, smooth, octagon shaped handle with a flat rectangular-shaped recess ("the notch") in the middle of one side of the handle. Within the notch, the name BIONIX is spelled out in raised capital letters. It is difficult to conceive of much greater differences between two handle designs, and certainly no ordinary observer would be confused. Clear and convincing evidence demonstrates that defendants' counterclaim of infringement was objectionably baseless.

Not only were the differences between the handles immediately apparent to the casual observer, but the accusers were aware of these differences from the beginning, as discussed in more detail below. Nevertheless, for a period of two years, from September 2005 to September 2007, defendants first threatened litigation, then insisted on litigating their patent infringement claim, first in one federal court, and then in another, all with no apparent hope of success. One can only conclude that defendants' aggressive posturing constituted "vexatious, unjustified, or frivolous litigation" in support of defendants' desire to keep plaintiffs' product off the shelves.

The evidence established that Milligan had had a Veteran Medical ear curette in his possession since 2005. Docket no. 103, at p. 80. Milligan testified that there were differences between the appearance of the Veteran Medical curette and Bionix's curette, such as the hourglass

appearance and the lack of a notch in the Veteran Medical curette's handle. *Id.* at 77-78. Milligan acknowledged at trial that neither the '669 patent nor the Veteran Medical curette had changed between 2005 and 2007. *Id.* at 79-81. In addition, defendant Huttner, a pediatrician, founder and part-owner of Bionix, testified that he was aware of patent '669 (he is listed as one of the inventors), that he saw images of the Veteran Medical ear curettes on the Veteran Medical website, that the images were reasonably clear to him and that he could make out the features of the ear curettes. Docket no. 120, at pp. 112, 133, 138-41, 195-96. Dr. Huttner admitted that he could determine that the Veteran Medical ear curettes had an hourglass shape and no notch. *Id.* at pp. 196-97. Defendants did not even dismiss their counterclaim after Veteran Medical obtained the '426 patent in March 2007.

Based on this record, the court concludes that plaintiffs have also shown by clear and convincing evidence that Bionix acted in bad faith (as that term has been previously defined above) by initially prosecuting, and by continuing to prosecute, the patent infringement litigation even after defendants Milligan and Dr. Huttner "knew or, on reasonable investigation, should have known" that there was no legal basis for a design patent infringement suit based upon the '669 patent. *See Haynes International, Inc.*, 9 F.3d at 1579.

In opposing this motion, defendants assert that plaintiffs failed to demonstrate an exceptional case because there was no inquiry made with respect to Bionix's decision to bring suit, no inquiry made about the legal advice sought, and that Bionix had to raise a mandatory counterclaim of patent infringement. Defendants' Mem. in Oppos. at p. 4 (docket no. 127). However, other than conclusory statements, defendants have failed provide any legal authority or argument in support of these contentions. Bionix's compulsory counterclaim argument, which implies that it was forced to file the counterclaim in this lawsuit, is less than persuasive. Plaintiffs filed this action on September 23, 2005. Defendants raised the patent

infringement claim in their own complaint filed in the Northern District of Ohio on October 4, 2005. Finally, defendants' filed their infringement counterclaim on October 13, 2006, after this court denied their motion to dismiss this action for lack of jurisdiction. *See* docket nos. 5, 13, 14 and 17. Defendants had more than one year to contemplate the merits of the patent infringement issue before filing the infringement counterclaim in this action. The court finds as a matter of fact that this is an exceptional case making it eligible for an award of attorneys fees. 35 U.S.C. § 285.

The court further finds that this is an appropriate case for an award of attorneys fees, due to the length of time defendants have forced plaintiffs to expend attorneys fees to defend against this baseless and unjustified litigation. The same factors that lead to a conclusion of bad faith, because they were stretched out over two years and created real consequences for the plaintiffs, lead to a conclusion that this was the type of claim Congress had in mind when it gave the court the discretion to award fees.

Accordingly, the court concludes that this is an exceptional case under 35 U.S.C. § 285 entitling plaintiffs to reasonable attorney fees incurred in defending the counterclaim for infringement of the '669 patent.

Dated: March 31, 2009                              /s/ Hugh W. Brenneman, Jr.
                                                   HUGH W. BRENNEMAN, JR.
                                                   United States Magistrate Judge

.